# IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE

In re

Case No.  14-32732

RIVER GLEN LAND PARTNERSHIP
a/k/a RIVER GLEN LAND PARTNERS

Debtor

## MEMORANDUM ON AMENDED MOTION
## FOR RELIEF FROM THE AUTOMATIC STAY AND ABANDONMENT
## OR, ALTERNATIVELY, FOR ADEQUATE PROTECTION

**APPEARANCES:**      GENTRY, TIPTON & MCLEMORE, PC
           Maurice K. Guinn, Esq.
           Post Office Box 1990
           Knoxville, Tennessee 37901
           Attorneys for the Debtor

           MORRIS/SCHNEIDER/WITTSTADT, LLC
           Brent Heilig, Esq.
           200 Jefferson Avenue
           Suite 1350
           Memphis, Tennessee 38103
           Attorneys for LPP Mortgage Ltd.

           SAMUEL K. CROCKER, ESQ.
           UNITED STATES TRUSTEE
           Kimberly C. Swafford, Esq.
           Howard H. Baker, Jr. United States Courthouse
           800 Market Street
           Suite 114
           Knoxville, Tennessee  37902
           Attorneys for United States Trustee

**SUZANNE H. BAUKNIGHT**
**UNITED STATES BANKRUPTCY JUDGE**

This contested matter is before the court upon the Motion for Relief From the Automatic Stay and Abandonment or, in the Alternative, for Adequate Protection (Motion for Stay Relief) filed by LPP Mortgage Ltd. (LPP Mortgage) on October 8, 2014, as amended on December 5, 2014, asking the court to find that this is a "single asset real estate" case as defined by 11 U.S.C. § 101(51B), seeking relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1), (2), and/or (3), and/or asking the court for adequate protection under 11 U.S.C. § 361. Debtor filed its Objection to Motion for Relief From the Automatic Stay and Abandonment or, Alternatively, for Adequate Protection (Objection) on October 28, 2014.

The evidentiary hearing on the Motion for Stay Relief was held on January 23, 2015. The record before the court consists of Stipulations, nineteen exhibits stipulated into evidence, and the testimony of two witnesses, William J. Graves and James Burke Wallace.

## I. Issues

Debtor filed the Voluntary Petition commencing its Chapter 11 case three days before a scheduled foreclosure sale by LPP Mortgage, which is a secured creditor of Debtor by virtue of a Note executed by a former partner of Debtor in the amount of $250,000.00. The June 9, 2005 Note is secured by a Deed of Trust recorded June 10, 2005, through which Debtor's former partner and Debtor's current majority partner, William J. Graves, granted a security interest in approximately 182 acres located at 1839 London Road, New Market, Jefferson County, Tennessee, known as River Glen Equestrian Park (Park Property). LPP Mortgage filed a proof of claim in the amount of $476,530.93, and holds a security interest in the Park Property junior to First Peoples Bank's claim of $95,593.48. The Note to LPP Mortgage matures on July 1, 2015.

As framed in the Joint Statement of Issues [Doc. 60], the court is to determine (1) whether this is a single asset real estate case as defined by § 101(51B) of the Bankruptcy Code;

1

and (2) whether LPP Mortgage is entitled to stay relief under § 362(d)(1), (2), and/or (3) or, alternatively, adequate protection under § 363(e).  However, because Debtor recently proposed a plan of reorganization, if the court finds that the proposed plan has a reasonable possibility of being confirmed within a reasonable time, the court need not reach the question of whether Debtor qualifies as a single asset real estate debtor under § 101(51B).  This is a core proceeding. 28 U.S.C. § 157(b)(2)(G).

## II.  Section 362(d)

The automatic stay provides debtors with the opportunity to protect assets and marshal their resources to satisfy outstanding obligations. *Laguna Assocs. Ltd. P'ship v. Aetna Cas. & Sur. Co. (In re Laguna Assocs. Ltd. P'ship)*, 30 F.3d 734, 737 (6th Cir. 1994).  Creditors should not, however, "be deprived of the benefit of their bargain" during the pendency of the automatic stay and may seek relief from the automatic stay. *In re Planned Sys., Inc.*, 78 B.R. 852, 860 (Bankr. E.D. Ohio 1987).  Motions for relief from the stay are governed by 11 U.S.C. § 362(d), which states, in material part:

> (d)  On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay —
>
> > (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
> >
> > (2) with respect to a stay of an act against property under subsection (a) of this section, if –
> >
> > > (A) the debtor does not have an equity in such property; and
> > >
> > > (B) such property is not necessary to an effective reorganization; [or]
> >
> > (3) with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of

the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later –

> (A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or

> (B) the debtor has commenced monthly payments that –

>> (i) may, in the debtor's sole discretion, notwithstanding section 362(c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien); and

>> (ii) are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate . . . .

The party seeking relief bears the burden of establishing "a *prima facie* showing of cause sufficient to support the party's request," after which the burden shifts to the debtor to show "lack of cause to grant relief" from the stay. *In re Scalera*, 521 B.R. 513, 517 (Bankr. W.D. Pa. 2014).

### A. Cause Under Subsection (d)(1)

"Cause" is not defined by the Bankruptcy Code; accordingly, "[t]he determination whether cause exists to lift the stay is a fact-intensive inquiry made on a case-by-case basis." *In re Shivshankar P'ship, LLC*, 517 B.R. 812, 817 (Bankr. E.D. Tenn. 2014) (citation omitted). LPP Mortgage's primary arguments under subsection (d)(1) are that Debtor has not made any payments under the Note in more than five years even though it allegedly is current on its debt on the first mortgage to First Peoples Bank, that Debtor is not making post-petition payments to

LPP Mortgage, that Debtor filed for bankruptcy on the eve of foreclosure, that Debtor has been

and continues to be mismanaged, and that LPP Mortgage's collateral is not adequately protected.

At trial, William Graves, 51% owner and managing partner of Debtor, did not dispute

that Debtor's payments with First Peoples Bank were current when the petition was filed and that

Debtor stopped paying LPP Mortgage regularly in 2009 and has not made any payments to LPP

Mortgage since making a $5,000.00 payment in October 2010.  As explanation, Mr. Graves

testified that in 2009, Debtor was a party to state-court litigation against a former partner of

Debtor's over ownership of the Park Property and that because Mr. Graves was unsure of the

outcome of the dispute, he decided to stop payments on the mortgage obligation to LPP

Mortgage's predecessor, Beal Bank.  After the state court initially decided the ownership issues

in Debtor's favor, Mr. Graves attempted to refinance Debtor's obligation with Beal Bank, but the

title company refused to write a title policy because of a problem with the wording of the state-

court judgment.  Debtor returned to state court to seek amendment of the judgment, which

amendment did not occur until June 2011.

Debtor also experienced additional financial problems in 2011 due to a state-wide

quarantine on horse shows that resulted in the cancellation of a hunter-jumper show, including

the loss of revenues for a third-party lease of the Park Property related to the cancelled show.

Mr. Graves testified that in 2012, Debtor had sufficient funds to pay the mortgage obligations

current. By that time, however, the second mortgage was no longer held by Beal Bank but had

been assigned to LPP Mortgage.  When Mr. Graves could get no response from LPP Mortgage's

loss mitigation department to negotiate resolution of debt, Mr. Graves and Debtor used the funds

that could have brought current the LPP Mortgage obligation for capital improvements of the

Park Property, including adding a wash house, water complexes, ditches and banks, portable jumps, and cross-country jumps.[1]

The court found Mr. Graves to be credible and his explanation as to why Debtor made no payments on its mortgage obligation to LPP Mortgage to be plausible. The record establishes that there was a genuine dispute over ownership of the Park Property, leading to litigation in state court, and during that time, notwithstanding LPP Mortgage's contention that only its mortgage was unpaid, Debtor did not make payments to either LPP Mortgage or First Peoples Bank. Mr. Graves testified that he did not want to pay debt on property that might not be owned by him or an entity owned in part by him. The court finds such conduct reasonable under the circumstances. Once ownership of the Park Property was resolved by the state court, however, Debtor worked with First Peoples Bank to bring its debt current in order to avoid a foreclosure.

With respect to LPP Mortgage, Mr. Graves explained that although Debtor had funds available to pay to LPP Mortgage, his attempts to work out an arrangement for payment on the second mortgage, first with Beal Bank and then with LPP Mortgage after he learned that LPP Mortgage was the successor in interest to Beal Bank, were unfruitful because LPP Mortgage did not communicate with Mr. Graves to negotiate a plan to catch up the obligation. Although in hindsight it might not have been altogether wise for Debtor to expend on capital improvements the funds it could have used to bring the second mortgage current, the evidence revealed nothing nefarious about Debtor's use of the funds.

Thus, the court does not find cause to grant relief from the stay under § 362(d)(1) either in Debtor's choice to maintain its first-mortgage obligation to First Peoples Bank even though it did not recommence payments to LPP Mortgage or in Debtor's choice to make capital

---

[1] James Burke Wallace, Debtor's accountant, testified that he, too, consulted with a representative of Beal Bank and that his attempts to contact representatives of LPP Mortgage on Debtor's behalf were also unsuccessful.

improvements in lieu of paying the funds to a non-communicative LPP Mortgage.  Finally, the

court does not find that Debtor's filing for Chapter 11 protection on the eve of foreclosure

constitutes cause for granting stay relief under § 362(d)(1), especially in light of the fact that

Debtor received no communication from LPP Mortgage until the foreclosure notice in November

2013 and that Debtor has now proposed a plan of reorganization with treatment for LPP

Mortgage.

Further, the court disagrees that LPP Mortgage is entitled to stay relief for cause under §

362(d)(1) on the basis that Debtor has been and is currently being mismanaged.  LPP Mortgage

has argued that Debtor misused funds on discretionary expenses when it should have been

paying the second mortgage, that Debtor paid unnecessarily high judges' fees and travel for only

four horse shows in 2013, and that Debtor pays unreasonable compensation to Mr. Graves and

insiders of Mr. Graves.  With respect to the travel expenses and compensation to judges for

competitions on Park Property, Mr. Graves testified that Debtor hosts four horse trials, at each of

which six judges, none of whom are relatives, are required and that it has, in the past, hosted

hunter-jumper shows that also require judges.  Unquestionably, employment of judges at each

horse show requires Debtor to compensate said judges, and the court can easily deduce that this

is a necessary and reasonable expense in the ordinary course of Debtor's business.

Similarly, the court finds that Mr. Graves sufficiently explained the payments made to

family members that were listed in Attachment A to Trial Exhibit 6.  Mr. Graves testified that

rather than hire employees, Mr. Graves himself handles the day-to-day operation of Debtor,

including all maintenance on the Park Property.  Additionally, to further defray the costs of

having regular employees, Debtor pays his girlfriend and members of his family to work the

various horse shows, and each person receives a Form 1099 that is reported to the Internal

Revenue Service.  The fact that Debtor hires insiders of Mr. Graves to perform the various tasks

for which he requires assistance during the horse shows produced by Debtor does not constitute

mismanagement; nor does the court find mismanagement by Debtor from the creditor's claim

that Debtor's payment of fees and expenses to judges is excessive.  As for LPP Mortgage's

argument that mismanagement is evidenced by Debtor's discretionary spending for capital

improvements in lieu of paying the second mortgage, as previously discussed, the court finds

plausible Mr. Graves's testimony that he decided to improve the Park Property and its income

potential only after he unsuccessfully attempted to contact LPP Mortgage, resulting in the

decision not to pay funds to an unknown entity without assurance that payment would cure the

previous default.

 LPP Mortgage also argues that stay relief should be granted under § 362(d)(1) because

Debtor has not made adequate protection payments to LPP Mortgage and the admitted equity

cushion on the Park Property is diminishing.

> The determination of whether a creditor's interest is adequately protected is not an
> exact science nor does it involve a precise arithmetic computation. Rather, it is
> pragmatic and synthetic, requiring a court to balance all relevant factors in a
> particular case, including the value of the collateral, whether the collateral is
> likely to depreciate over time, the debtor's prospects for a successful
> reorganization and the debtor's performance under the plan.  Other considerations
> may include the balancing of hardships between the parties and whether the
> creditor's property interest is being unduly jeopardized. *In re Rogers*, 239 B.R.
> 883, 887 (Bankr. E.D. Tex. 1999) (citing *In re Olick*, 221 B.R. 146, 161 (Bankr.
> E.D. Pa. 1998)).  A secured creditor retains the right to "adequate protection" of
> its collateral, which means it is entitled to have the value of its collateral
> maintained at all times, and it can obtain relief from the automatic stay and take
> back its collateral at any time if that interest is not adequately protected or for
> other "cause." *Price v. Del. State Police Fed. Credit Union (In re Price)*, 370 F.3d
> 362, 373 (3d Cir. 2004).

*In re Bushee*, 319 B.R. 542, 551-52 (Bankr. E.D. Tenn. 2004).  "Adequate protection comes in a

variety of forms, including periodic payments, additional or replacement liens, or other relief that

provides the 'indubitable equivalent' to the protections afforded to the creditor outside of

bankruptcy." *In re Biltwood Props., LLC*, 473 B.R. 70, 74 (Bankr. M.D. Pa. 2012) (citations

omitted).

A creditor is adequately protected in a number of circumstances.  The Bankruptcy Code

expressly addresses how adequate protection may be provided when required under another

Code section, including § 362:

> (1)  requiring the trustee to make a cash payment or periodic cash payments to
> such entity, to the extent that the stay under section 362 of this title . . . results in a
> decrease in the value of such entity's interest in such property;
>
> (2) providing to such entity an additional or replacement lien to the extent that
> such stay . . . results in a decrease in the value of such entity's interest in such
> property; or
>
> (3) granting such other relief, other than entitling such entity to compensation
> allowable under section 503(b)(1) of this title as an administrative expense, as
> will result in the realization by such entity of the indubitable equivalent of such
> entity's interest in such property.

11 U.S.C. § 361.  Adequate protection may also be found by the existence of an equity cushion,

which "exists when the appraised value of the collateral is greater than the amount owed on the

loan."  *In re Nichols*, 440 F.3d 850, 856 (6th Cir. 2006); *see also Baybank-Middlesex v. Ralar*

*Distrib., Inc*., 69 F.3d 1200, 1203 (1st Cir. 1995) ("A sufficient equity cushion is itself a

recognized form of adequate protection, thus collateral valuation is a logical step in making an

adequate protection determination."); *In re Dye*, 502 B.R. 47, 55 n.9 (Bankr. M.D. Pa. 2013)

(defining equity cushion "as the value of the property above the amount owed to the moving

secured creditor and all liens with priority over the movant's lien").  The existence of "an equity

cushion is generally considered prima facie evidence of adequate protection." *Planned Sys., Inc*.,

78 B.R. at 862 (citations omitted).  Nevertheless, "[t]he concept of adequate protection was not

designed or intended to place an undersecured or minimally secured creditor in a better post-

filing [position] than it was in before the stay." *Shivshankar P'ship, LLC*, 517 B.R. at 817

(quoting *Planned Sys., Inc.,* 78 B.R. at 862).

With respect to its adequate protection arguments as ground for relief under § 362(d)(1),

the court finds that LPP Mortgage has not proved its entitlement to stay relief.  The record

establishes that there is a sufficient equity cushion such that LPP Mortgage is adequately

protected, and no further payments are required at this time, especially in light of the fact that

Debtor has proposed a plan providing for payments to LPP Mortgage.  LPP Mortgage's own

appraiser, Valbridge Property Advisors, assigned a $700,000.00 value in January 2014.

Although Mr. Graves testified that he believes that the county's tax assessment value of

$1,335,800.00 assigned to the property is a more accurate value for the Park Property, even

assuming that the $700,000.00 value is proper and without making a determination of the correct

valuation, the court finds that there is an undisputed equity cushion of at least $127,875.59 in the

Park Property (calculated by subtracting from the appraised value the total debt against the

property in the amount of $572,124.41, comprised of the first mortgage of $95,593.48 owed to

First Peoples Bank and the $476,530.93 second mortgage owed to LPP Mortgage).

In conclusion, the court finds that cause does not exist to grant relief from the stay to LPP

Mortgage under § 362(d)(1).

### B.  Failure to Provide Adequate Protection under Subsection (d)(2)

In its Motion for Stay Relief, LPP Mortgage also sought stay relief under § 362(d)(2).  A

creditor first must show lack of equity before the burden shifts to the debtor on all other issues.

*See* 11 U.S.C. § 362(g).  Because LPP Mortgage concedes that there is equity in the Park

Property, relief may not be granted under § 362(d)(2).

### C.  Relief Against a Single Asset Real Estate Debtor under Subsection (d)(3)

Finally, LPP Mortgage seeks a determination that Debtor falls within the scope of §
362(d)(3), which permits stay relief against a single asset real estate debtor that has not, within
ninety days of the petition date or of a finding by the court that § 101(51B) applies, (1) filed a
plan that has a reasonable possibility of being confirmed or (2) has not commenced monthly
payments to the creditor whose claim is secured by the real property.  As its basis for seeking
stay relief under this subsection, LPP Mortgage argues that Debtor falls within the Bankruptcy
Code's definition of single asset real estate and that Debtor's proposed plan is unconfirmable on
its face, that Debtor's November monthly operating report reflects that Debtor has generated a
net loss of $15,369.00 since the commencement of the case without meeting any of its debt-
service obligations during that time, and that Debtor is mismanaging the Park Property by
obligating itself with loans from insiders and former partners and hiring friends and family
members of general partners while its gross revenues have significantly declined.  Because the
court finds that LPP Mortgage did not prove that Debtor's proposed Plan of Reorganization for
River Glen Land Partnership filed on January 8, 2015, does not have a reasonable possibility of
being confirmed, the court need not decide whether Debtor meets the definition for single asset
real estate.[2]

The standard concerning a plan's reasonable possibility of being confirmed "is a broad
standard that requires the court to consider how the current plan stacks up against the

---

[2] The Bankruptcy Code defines "single asset real estate" as follows:

> The term "single asset real estate" means real property constituting a single property or project,
> other than residential real property with fewer than 4 residential units, which generates
> substantially all of the gross income of a debtor who is not a family farmer and on which no
> substantial business is being conducted by a debtor other than the business of operating the real
> property and activities incidental.

11 U.S.C. § 101(51B).

confirmation requirements in § 1129. The debtor is not obliged to prove it will confirm the plan

it has filed; instead the test is whether the plan is confirmable." *In re RIM Dev., LLC*, 448 B.R.

280, 288 (Bankr. D. Kan. 2010).

> As the foregoing implies, the debtor's plan will be measured against 11
> U.S.C. § 1129's confirmation requirements. However, the debtor's burden is less
> onerous under Section 362(d)(3)(A) than it is at confirmation; a debtor need not
> prove that its plan *shall be* confirmed. A mini-confirmation hearing is not
> required, nor is it appropriate, absent good reason to continue to restrain the
> lender from exercising its rights. While the debtor's plan does not have to be
> perfect, the plan, together with the evidence and the debtor's arguments, must
> delineate a credible path to reorganization. Hurdles to plan confirmation must be
> addressed in a way that provides the court with grounds to conclude (i) it is more
> likely than not they will be overcome, and (ii), because there is a time element,
> they can be overcome promptly. Unless the plan has a true prospect of being
> confirmed within a reasonable time, or timely payments have been made, a
> secured creditor should not be compelled to endure further delay, expense, and
> risk.

*In re RYYZ, LLC*, 490 B.R. 29, 37 (Bankr. E.D.N.Y. 2013) (emphasis in original); *see also In re*

*RIM Dev., LLC*, 448 B.R. at 289 ("[T]he Court should not expose the debtor to the same level of

scrutiny that it will endure if its plan makes it to confirmation, but the Court does require that

debtor demonstrate that its plan has 'a realistic chance of being confirmed [and] is not patently

unconfirmable.'" (quoting *In re Carlsbad Dev. I, LLC*, No. 08-27768, 2009 WL 588662, at *3,

2009 Bankr. LEXIS 754, at *10, (Bankr. D. Utah Mar. 6, 2009))); *In re Winwood Heights, Inc*.,

385 B.R. 832, 838 (Bankr. N.D. W. Va. 2008) ("[T]he showing required by a debtor under §

362(d)(3)(A) is only that the plan have a reasonable possibility of being confirmed, which is a

lesser showing than that required at confirmation.").

Debtor filed its Plan of Reorganization on January 8, 2015, along with the Disclosure

Statement of River Glen Land Partnership.[3] The Plan of Reorganization provides for six classes:

- Class 1 consists of the secured claim of First Peoples Bank to be paid in
  quarterly payments of $1,818.00 beginning on June 30, 2015, at 4.25%

---

[3] The hearing on the adequacy of Debtor's Disclosure Statement is scheduled for February 19, 2015.

interest, with a maturity date of the tenth anniversary of the plan's
Effective Date.

- Class 2 consists of LPP Mortgage's claim, bifurcated into two
components. The first component, in the amount of $331,464.42,
represents principal, pre-petition fees, expenses, and charges, and is to be
paid in quarterly installments of $6,226.00 beginning on June 30, 2015, at
4.25% interest, with a final payment on the tenth anniversary of the
Effective Date. The second component, in the amount of $146,066.51,
represents pre-petition interest and is to be paid in monthly installments of
$608.00, beginning on June 30, 2015, until the tenth anniversary of the
Effective Date. At that time, a balloon payment will be made to pay the
balance of LPP Mortgage's secured claim.

- Class 3 consists of unsecured claims in amounts of $5,000.00 or less to be
paid a pro rata share from a monthly payment of $415.28 beginning on
June 30, 2015, and continuing for thirty-six months. This class will
receive a total of $14,950.00 without interest.

- Class 4 consists of unsecured claims in amounts greater than $5,000.00 to
be paid a pro rata share from a monthly payment of $2,108.33 beginning
on July 30, 2018, and continuing through June 30, 2023. This class will
receive a total of $126,500.00 without interest.

- Class 5 consists of the claim of Kramer Rayson LLP in the amount of
$72,500.00 to be paid in monthly installments of $2,157.00 beginning on
June 30, 2015, plus 4.25% interest.

- Class 6 consists of the equity security holders, each of whom will receive
no distribution under the plan but will retain his or her pre-petition
interest.

11 U.S.C. § 1129 enumerates sixteen requirements for confirmation of a Chapter 11 plan.

If all of the requirements of § 1129(a) are met, the plan will be confirmed if it "does not

discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests

that is impaired under, or has not accepted, the plan." 11 U.S.C. § 1129(b)(1). Additionally, each

plan must contain certain provisions, such as designation of classes, treatment of claims, and

adequate means of implementation, among others, *see generally* 11 U.S.C. § 1123, and within

the context of class designation and treatment, a debtor is afforded the ability to impair classes of creditors pursuant to 11 U.S.C. § 1124.

LPP Mortgage argues that Debtor's proposed plan is not confirmable as a matter of law because it was not proposed in good faith under § 1129(a)(3) in that it violates the provisions of § 506(a) by bifurcating LPP Mortgage's claim, it does not satisfy § 1129(a)(7) because creditors would receive more in a liquidation than they will receive under the proposed plan, and it is not feasible as required by § 1129(a)(11). LPP Mortgage also argues that the proposed interest rate does not reflect a market rate and that the balloon payment at the end of the payment schedule is unreasonable.

## 1. Good Faith

"Good faith under § 1129(a)(3) is 'generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'" *In re City of Detroit*, ___ B.R. ___, 2014 WL 7409724, at *90 (Bankr. E.D. Mich. Dec. 31, 2014) (quoting *In re Waterford Hotel, Inc.*, 497 B.R. 255, 266 (Bankr. E.D. Mich. 2013) (citations omitted)); *see In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 469 (Bankr. S.D. Ohio 2011) ("Two primary purposes of chapter 11 relief are the preservation of businesses as going concerns, and the maximization of the assets recoverable to satisfy unsecured claims." (quoting *Fields Station LLC v. Capitol Food Corp. of Fields Corner (In re Capitol Food Corp. of Fields Corner)*, 490 F.3d 21, 25 (1st Cir.2007))). "Good faith also generally requires that the plan be proposed 'with honesty and good intentions, and with a basis for expecting that a reorganization can be effected,' and that the plan proponent deal with its creditors in a manner that is fundamentally fair." *City of Detroit*, 2014 WL 7409724, at *91 (quoting *In re Gregory Boat Co.*, 144 B.R. 361, 366 (Bankr. E.D. Mich. 1992)). An analysis of

13

good faith and ultimate determination is fact-intensive and based upon a totality of the circumstances. *Fed. Nat'l Mortg. Ass'n v. Village Green I, GP*, 483 B.R. 807, 822 (W.D. Tenn. 2012).

Here, LPP Mortgage argues that Debtor's plan provision for bifurcating its secured claim does not satisfy § 1129(a)(3) because it violates the provisions of § 506 governing the determination of secured status of claims.  The court, however, did not hear any other argument from LPP Mortgage referencing § 1129(a)(3) as a basis for finding that Debtor's proposed plan does not have a reasonable possibility of being confirmed.  Without making a determination as to whether the Plan of Reorganization may, in fact, bifurcate LPP Mortgage's claim, such an attempt is not, on its face, evidence of bad faith, nor does it render a plan patently unconfirmable. If LPP Mortgage is dissatisfied with its treatment under the proposed plan, or believes that its proposed treatment is unfair and inequitable, it may reject the plan and object to confirmation at that stage; however, such proposed treatment does not prove that a plan was proposed in bad faith or that it has no reasonable expectation of being confirmed.  The same is true for LPP Mortgage's argument that the proposed 4.25% interest rate is inadequate.

### 2.  Best Interests of Creditors

LPP Mortgage next argues that the Plan of Reorganization does not satisfy the best-interests-of-creditors test.  The "best interests" requirement imposed by § 1129(a)(7) requires that any creditor that votes to reject a plan "must receive, under the plan, at least what they would have received if the debtor were to liquidate under Chapter 7." *In re Christian Faith Assembly*, 402 B.R. 794.799 (Bankr. N.D. Ohio 2009) (citing *Bank of Am. Nat'l Trust & Sav. Assoc. v. 203 N. La Salle St. P'ship*, 526 U.S. 434, 441 n.13 (1999)).  In deciding whether an impaired creditor would receive a greater amount in a Chapter 7 liquidation case, the court must

14

consider, as of the effective date of the plan, "the amount of the creditors' claims and the liquidation value of the assets of the estate." *In re SAI Holdings Ltd*., No. 06-33227, 2007 WL 927936, at *7-8, 2007 Bankr. LEXIS 1051, at *26 (Bankr. N.D. Ohio Mar. 26, 2007).  Valuation, which "is to be based on evidence not assumptions[] but . . . is not an exact science," *In re Draiman*, 450 B.R. 777, 809 (Bankr. N.D. Ill. 2011), is determined "as of the effective date of the plan," 11 U.S.C. § 1129(a)(7)(A)(ii).

> "The requirement that the 'value' of the property to be distributed be determined 'as of the effective date of the plan' incorporates the principle of the time value of money."  There is no doubt, therefore, that a Chapter 11 plan does not satisfy the best-interests-of-creditors test if the debtor, rather than paying a creditor the amount it would receive in a Chapter 7 liquidation in full on the effective date of the plan, proposes instead to pay that same amount over time.  In order to satisfy the best-interests-of-creditors test, a debtor making deferred cash payments must pay more than the liquidation amount in order to compensate creditors for the time value of money lost because of the delay in payment.

*In re Hockenberry*, 457 B.R. 646, 653-54 (Bankr. S.D. Ohio 2011) (quoting *Till v. SCS Credit Corp.*, 541 U.S. 465, 486-87 (2004) (citation omitted)).

No evidence was presented by either LPP Mortgage or Debtor concerning the present versus future value of LPP Mortgage's claim within the context of the best-interests test or the appropriate interest rate adjustment required in making such a determination.  Without making any determination as to what would be an appropriate interest rate adjustment in order to find the value of LPP Mortgage's claim if paid under the proposed plan versus being paid at liquidation, the court can determine that the Plan of Reorganization is not unconfirmable on its face for not satisfying the requirements of § 1129(a)(7).  Debtor's November 2013 Monthly Operating Report, introduced into evidence as Trial Exhibit 13, evidences total assets of $1,421,048.00.  [Trial Ex .13.]  This total includes Debtor's valuation of the Park Property at $1,335,800.00, instead of $700,000.00.  Based upon that total, after deducting the $95,593.48 first mortgage to

15

First Peoples Bank and the $476,530.93 second mortgage to LPP Mortgage, and using LPP

Mortgage's $700,000.00 valuation for the Park Property rather than Debtor's scheduled value,

although liquidation would result in payment in full of the mortgages owed to First Peoples Bank

and LPP Mortgage, it would result in payment of only $213,123.59 to unsecured creditors

included in Classes 3, 4, and 5, who will receive a minimum combined amount of $213,950.00

under the proposed plan.  Accordingly, the court cannot find, based upon the record before it,

that the proposed Plan of Reorganization fails to meet the requirements of § 1129(a)(7).

### 3.   Feasibility

Finally, LPP Mortgage argues that the plan is not feasible as required by § 1129(a)(11).

Whether a proposed plan is feasible is fact-intensive; however, for purposes of evaluation under

§ 362(d)(3), Debtor is not required to "guarantee success," *In re Made in Detroit, Inc.*, 299 B.R.

170, 176 (Bankr. E.D. Mich. 2003) (citations omitted); instead, "the plan need only present a

'reasonable assurance of success' by sufficiently establishing 'a realistic and workable

framework for reorganization.'" *In re Fairvue Club Props., LLC*, Nos. 309-13807, 310-03566,

309-14911, 2010 WL 4501959, at *3, 2010 Bankr. LEXIS 3888, at *9 (Bankr. M.D. Tenn. Nov.

2, 2010) (quoting *Gen. Elec. Credit Equities, Inc. v. Brice Rd. Devs., LLC (In re Brice Rd. Devs.,

LLC)*, 392 B.R. 274, 283 (B.A.P. 6th Cir. 2008)).  Although success need not be guaranteed, "a

court cannot confirm a visionary scheme that promises creditors more than the debtor can

possibly attain after confirmation, notwithstanding the proponent's sincerity, honesty and

willingness to make a best efforts attempt to perform according to the terms of the plan." *In re

Am. Homepatient, Inc.*, 298 B.R. 152, 169 (Bankr. M.D. Tenn. 2003) (internal quotations and

citations omitted).

A court's feasibility analysis is required "to scrutinize a debtor's proposed plan payments in light of projected income and expenses in order to determine whether it is likely the debtor will be able to make the payments required by the plan." *In re Howard*, 212 B.R. 864, 879-80 (Bankr. E.D. Tenn. 1997). Factors relevant for a finding of feasibility include: "(1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan." *In re Hurricane Memphis, LLC*, 405 B.R. 616, 624-25 (Bankr. W.D. Tenn. 2009) (quoting *Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co., Inc. (In re U.S. Truck Co., Inc.)*, 800 F.2d 581, 589 (6th Cir. 1989) (citation omitted)).

LPP Mortgage argues that Debtor's Plan of Reorganization is not feasible based on the losses and deterioration of cash shown in the monthly operating reports, all occurring while Debtor was making no debt-service payments. LPP Mortgage also questions the budget, which anticipates increased revenues but decreased expenses and operating costs. In short, LPP Mortgage believes Debtor's Plan of Reorganization is overly optimistic and unworkable.

Debtor's Statement of Income and Expense for 2014 horse trials reflects an average gross profit of $22,708.50[4] for each of the four shows with an average cost to produce each show totaling $47,418.75. [Trial Ex. 15 Ex. A, p. 1; Trial Ex. 19.] The combined expenses associated with the 2014 horse trials totaled $189,675, of which $29,845 was for course design and maintenance and an additional $19,459 was for refunds. [*Id.*] In addition to the horse trial

---

[4] Trial Exhibit 19 reflects expenses for the four horse trials totaling $189,675.00. The calculation of expenses on Exhibit A to Trial Exhibit 15 (showing the same costs for each of the itemized expenses but a total of $188,924) includes a mathematical error. Subtracting the correctly calculated amount of $189,675.00 results in average gross profit of $22,708.50, not $22,896 as reflected on Exhibit A to Trial Exhibit 15.

expenses, Debtor incurred $122,588 for general operating expenses in 2014, of which $24,150 was for legal fees paid to Debtor's bankruptcy counsel. [Trial Ex. 15 Ex. A, p. 2.] The record, however, does not reflect Debtor's additional 2014 income from sources other than the four horse trials.

James Burke Wallace, Debtor's accountant, testified that he prepared the 2014 income and expense reports as well as the 10-year projections. He explained that Debtor should have lower costs to produce the shows in 2015 than in 2014 because there will be no course design or course maintenance fees and no refunds for over-booked shows[5] and because Debtor anticipates reducing judge fees and travel expenses to the extent possible. Such anticipated cost reductions (along with a few other anticipated reductions deemed immaterial) result in a projected 2015 total cost to produce the horse trials at $138,000, down from $189,675 in 2014. [Trial Ex. 19.] Mr. Wallace projected expenses to remain constant throughout the life of Debtor's proposed plan, stating that with the 2014 updates to the courses, he does not anticipate any further need to upgrade or spend the discretionary expenses as in 2014.

As for income projections, Mr. Wallace testified that the total 2015 gross profit from shows is projected to be higher, in part, because the April show is not scheduled for Easter weekend as it had been in 2014, which resulted in substantially reduced entries. Further, Mr. Wallace's projections reflect higher income for the June 2015 show because 2014 was the first year for the June show, and a first-show historically has fewer entrants than in subsequent years. Finally as to increased anticipated gross revenues, Debtor intends to add to its future schedule of events a dressage show and a schooling show, with associated, anticipated, combined revenues totaling $10,000. [Trial Ex. 15 Ex. B, p. 1.]

---

[5] Mr. Graves also testified that there will be no need for course design or maintenance expenses after 2014 and that the refund expense was related to over-booked shows that should not happen again.

Debtor's proposed 10-year figures for 2015-2024, attached to the Disclosure Statement, reflect gross profits in the amount of $167,100.00 for each year, with ending cash flow of $18,204.00 for 2015, $14,232.00 for 2016, $10,259.00 for 2017, $6,604.00 for 2018, $11,944.00 for 2020, $9,102.00 for 2022, $12,772.00 for 2023, and $15,542.00 for 2024.[6]  [Trial Ex. 15 Ex. B.]  Mr. Wallace also testified that Debtor may potentially raise its entry fees in the event expenses increase above what has been projected.  With respect to the balloon payments to be paid to First Peoples Bank and LPP Mortgage at the end of their payment terms under the Plan of Reorganization, Mr. Wallace testified that he expects to refinance both creditors' loans and that, based upon his having run a mortgage company for twenty-five years, he has experience negotiating and working out such loans.

Mr. Graves testified, and the record reflects, that Debtor has hosted only one major show since filing its bankruptcy case, in November 2014, but it has scheduled horse trials for the last three days each of April, June, August, and November 2015.  He testified that Debtor generally begins receiving entries approximately six weeks before a scheduled show, but most are received in the week immediately prior to a show, providing Debtor with a six-to-seven-week income stream for each show.  Additionally, Debtor hosts schooling shows, which do not require certified judges, clinics by riders giving lessons, thirty camper/RV hookups, and thirty-six vendor hookups.

By way of explanation about why the lower income and revenues of recent years is not anticipated to recur post-petition, Mr. Graves testified that Debtor suffered from the state-wide quarantine on horse shows in 2011, which cost Debtor a hunter-jumper show as well as revenues from a third-party that had contracted to lease the Park Property to run the show.  He also noted the unfortunate scheduling of the April 2014 show on Easter weekend (with the resulting

---

[6] Information for the years 2019 and 2021 was omitted.  [Trial Ex. 15 Ex. B.]

decreased entries) and that the June 2014 show was new such there were fewer entries than would be expected for a more seasoned show.

Clearly, Debtor's income is seasonal, based primarily on Debtor producing and hosting four major horse trials in April, June, August, and November. The 10-year projections reflect a budget based almost entirely on Debtor's quarterly cash flow, as well as a reasonably expected decrease in the need for discretionary spending during the life of the plan. Based upon the projections themselves and the testimony explaining such projections, the court cannot conclude that Debtor has failed to "delineate a credible path to reorganization." *In re RYYZ, LLC*, 490 B.R. at 37.

Accordingly, because the court does not find that the Plan of Reorganization proposed by Debtor on January 8, 2015, is unconfirmable on its face or as a matter of law based upon any of the arguments raised by LPP Mortgage, the court additionally finds that LPP Mortgage is not entitled to stay relief under § 362(d)(3).

Having disposed of all of LPP Mortgage's arguments under § 362(d), the court will deny the Motion for Stay Relief. An Order consistent with this Memorandum will be entered.

FILED:  February 11, 2015

BY THE COURT

*/s/ Suzanne H. Bauknight*

SUZANNE H. BAUKNIGHT
UNITED STATES BANKRUPTCY JUDGE

20